UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ecolab Inc., and Ecolab USA Inc.,        File No. 22-cv-479 (ECT/DTS)

       Plaintiffs,

v.            **OPINION AND ORDER**

IBA, Inc., Webco Chemical Corporation, and
Custom Chemical Formulators, Inc.,

       Defendants.

---

Rachel Zimmerman Scobie, Eric R. Chad, Michael A. Erbele, and Paige S. Stradley, Merchant & Gould P.C., Minneapolis, MN, for Plaintiffs Ecolab Inc. and Ecolab USA Inc.

Caitlinrose H. Fisher and Robert J. Gilbertson, Forsgren Fisher, Minneapolis, MN, for Defendant IBA, Inc.

Brian R. Battina and Craig W. Trepanier, Trepanier MacGillis Battina P.A., Minneapolis, MN, and Christine K. Bush, Hinckley, Allen & Snyder, LLP, Providence, RI, for Defendant Webco Chemical Corporation.

Larina A. Alton, Maslon LLP, Minneapolis, MN, for Defendant Custom Chemical Formulators, Inc.

---

Plaintiffs—who, following their lead, will be referred to jointly as "Ecolab"—claim Defendants misappropriated confidential information and trade secrets related to acidified sodium chlorate bovine teat-dip products. These products are applied to the teats of lactating cows to control the spread of mastitis.[1]

---

[1] "Bovine mastitis is an inflammation of the mammary gland caused from trauma or an infection, leading to abnormal and decreased milk production." *Bovine Mastitis*, Cornell University College of Veterinary Medicine, https://www.vet.cornell.edu/departments-

Two of the three Defendants—Webco Chemical Corporation and Custom Chemical Formulators, Inc.—have moved to dismiss the case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Alternatively, Custom Chemical seeks dismissal on the merits under Rule 12(b)(6) or, failing that, a more definite statement under Rule 12(e).

Webco and Custom Chemical's Rule 12(b)(2) motions will be granted.[2] The record evidence, construed in a light most favorable to Ecolab, does not show that Webco or Custom Chemical had or maintained contacts with Minnesota sufficient to warrant the exercise of specific personal jurisdiction over either organization. For legal and practical reasons, Ecolab will not be granted the opportunity for jurisdictional discovery. Ecolab's separate motion to seal the hearing transcript also will be denied because a thorough review of that transcript shows that it discloses no claimed trade-secret information.

I

*The original license agreement between Alcide and IBA.* The relevant background facts begin with a license agreement between Ecolab's predecessor in interest, Alcide Corporation, and IBA. *See* ECF No. 61-1 ("Agreement"). The Agreement is dated April 26, 2002. *Id.* At that time, Alcide possessed intellectual property "and information relating to products intended for use in the prevention of mastitis in dairy cattle." *Id.* at 1, ¶ A.

---

centers-and-institutes/baker-institute/our-research/bovine-mastitis (last visited Oct. 25, 2023).

[2]    Because Ecolab's claims will be dismissed on personal jurisdiction grounds, it would be inappropriate to consider Custom Chemical's alternative grounds for dismissal.

Under the Agreement, Alcide granted IBA "a non-exclusive license . . . to make, have made, use, sell and import" "external udder care products" in consideration for a licensing fee to be paid by IBA. *Id.* ¶¶ 2.1 (granting non-exclusive license in "the Product"); 1.2 (defining "Product" to mean "Alcide® external udder care products"); 3.1 (describing licensing fee). The Agreement originally had a five-year term. *Id.* ¶ 1.1. During that term, the Agreement forbade IBA from manufacturing or marketing "an acidified sodium chlorate teat dip product other than" Alcide's products. *Id.* ¶ 2.5b; *see id.* ¶ 2.1 (prohibiting IBA from manufacturing external udder care products "for a third party"). The Agreement included a confidentiality provision governing each party's handling of the other's confidential information. *See id.* ¶ 7. The confidentiality provision, among others, "survive[d] termination or expiration of" the Agreement. *Id.* ¶ 5.6. The Agreement authorized IBA to have Alcide's acidified sodium chlorate teat-dip products "manufactured by one or more third party manufacturers." *Id.* ¶ 2.5. If IBA went that route, the Agreement required any third-party manufacturer to "agree to the same manufacturing, non-compete and confidentiality provisions as agreed by IBA." *Id.*[3]

---

[3]     The third-party manufacturing provision reads as follows:

> IBA may, at its option, arrange to have [Covered Products] manufactured by one or more third party manufacturers provided, however, that each such third party manufacturer must as a condition of manufacturing [Covered Products] for IBA and agree to the same manufacturing, non-compete and confidentiality provisions as agreed by IBA including, but not limited to those expressed in paragraphs, 2.1, 5.5, and 7.

3

*The Ecolab/Alcide merger and amendments to the original license agreement.*  At some point between the Agreement's April 26, 2002 effective date and November 1, 2004, Ecolab became "the successor in interest by way of merger to Alcide."  ECF No. 61-2.  Following this merger, Ecolab and IBA executed four amendments to the Agreement.  As relevant here, the first amendment reflected the Ecolab/Alcide merger and extended the Agreement's term to May 31, 2009.  *Id.* at 1 (introductory paragraph) and ¶ 1.  The second amendment replaced Washington law with Minnesota's as the parties' choice of governing law and extended the Agreement's term to May 31, 2014.  ECF No. 61-3 ¶¶ 1, 9.11.[4]  The third amendment extended the Agreement's term to May 31, 2019.  ECF No. 61-4 ¶ 2.  The fourth amendment addressed a license-fee-rebate provision that is not relevant here.  ECF No. 61-5.

*Webco and Custom Chemical.*  Webco and Custom Chemical are third parties that manufactured external udder care products for IBA pursuant to, and during the term of, the Agreement.  Am. Compl. ¶¶ 8, 25.  The record does not indicate when Webco or Custom Chemical began their manufacturing relationships with IBA, but that does not seem to matter.  Webco is incorporated under Massachusetts law and maintains its principal place of business in Dudley, Massachusetts.  *See id.* ¶ 6; ECF No. 79 ¶¶ 1, 4, 5, 7.  Custom

---

ECF No. 61-1 ¶ 2.5.  The Agreement is not explicit concerning who had responsibility for ensuring that a third-party manufacturer "agree[d] to the same manufacturing, non-compete and confidentiality provisions as agreed by IBA."  *Id.*

[4]     The choice-of-law clause read: "This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota (without application of its choice of law provisions)."  ECF No. 61-3 ¶ 9.11.

Chemical is incorporated under California law and maintains its principal place of business in California.  Am. Compl. ¶ 7; EC No. 90 ¶¶ 2, 3.

*Ecolab's primary factual allegations.*  The core factual basis of Ecolab's claims seems straightforward.  Ecolab alleges that "a vast quantity of technical information was disclosed by Alcide to IBA under the License Agreement, including, but not limited to trade secrets, technical reports, and proprietary data relating to formulations, test results, and manufacturing know-how."  Am. Compl. ¶ 17.  Ecolab alleges that the information Alcide disclosed was subject to the Agreement's confidentiality terms "which prevented IBA from using any confidential, proprietary, or trade secret information disclosed by Alcide for any purpose other than fulfilling the relationship established by the License Agreement."  *Id.* ¶ 18.  Ecolab and IBA attempted without success to negotiate a formal extension of the Agreement beyond its termination date of May 31, 2019.  *Id.* ¶ 27; *see* ECF No. 61-4 ¶ 2.  After that date, "Ecolab continued to conform its conduct to the terms of the License Agreement," and IBA represented it was doing likewise.  Am. Compl. ¶¶ 28, 29.  However, Ecolab claims IBA was violating the Agreement by marketing acidified sodium chloride teat-dip products not covered by the Agreement.  *Id.* ¶ 34.  Ecolab notified IBA that the Agreement was terminated effective January 6, 2022.  *Id.* ¶ 35.

*Ecolab's legal claims.*  Ecolab asserts four claims against just IBA: breach of contract (Count I), *id.* ¶¶ 36–53; trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count IV), *id.* ¶¶ 79–91; unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count V), *id.* ¶¶ 92–102; and "unfair competition" under Minnesota law (Count VI), *id.* ¶¶ 103–105.  Ecolab asserts two claims against all Defendants: a misappropriation

5

claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b) (Count II), *id.* ¶¶ 54–73; and a misappropriation claim under the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.02–.04 (Count III), *id.* ¶¶ 74–78.

II

A

"Personal jurisdiction . . . is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (citation and internal quotation marks omitted). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Id.* (citations omitted). "But where, as here, the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citation omitted). At this summary-judgment-equivalent stage, a case should not be dismissed for lack of personal jurisdiction "if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id.* (citations omitted).

The issue boils down to determining whether the exercise of personal jurisdiction over Webco and Custom Chemical would satisfy constitutional due process. *See DURAG Inc. v. Kurzawski*, No. 17-cv-5325 (ECT/HB), 2020 WL 2112296, at *3 (D. Minn. May 4, 2020). Due process requires that each defendant has sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (citations and internal quotation marks omitted). This means "actions by the defendant[s] themselves must "create a substantial connection with the forum [s]tate" and provide "fair warning" to defendants that they may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citations and internal quotation marks omitted); *accord*, *e.g.*, *Creative Calling Sols.*, 799 F.3d at 980 (defendant's contacts must permit it to "reasonably anticipate being haled into court" in the foreign state (citation and internal quotation marks omitted)). The "fair warning" requirement will be met if defendants have "purposefully directed [their] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472–73 (citations and internal quotation marks omitted).

Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether a defendant has sufficient minimum contacts with the forum state to justify a finding of personal jurisdiction: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785,

794 (8th Cir. 2010). The first three factors are of primary importance, whereas the remaining two are secondary. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (citation omitted). "In determining whether there is personal jurisdiction, the courts consider the defendant's contacts with the forum in the aggregate, not individually; they look at the totality of the circumstances." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995) (citation omitted).

B

To set the table for the personal-jurisdiction analysis with respect to Webco and Custom Chemical, it helps to begin by framing the Parties' positions. In the Amended Complaint, Ecolab directly addresses the personal-jurisdiction question as to Webco and Custom Chemical in one paragraph. There, Ecolab alleges the legal conclusion that there is "at least specific personal jurisdiction over Webco and Custom Chemical, including because the actions of Webco and Custom Chemical that are the subject of the claims asserted against them in this action were taken with full knowledge that the injury resulting therefrom would be felt by Ecolab in Minnesota." Am. Compl. ¶ 14. This allegation tracks the "effects test" described in *Calder v. Jones*, 465 U.S. 783 (1984), *see Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp.*, 74 F.4th 928, 931 (8th Cir. 2023) (describing *Calder*'s effects test), implying that Ecolab's personal-jurisdiction theory as to Webco and

Custom Chemical depends only on applying *Calder*'s effects test to these two Defendants' activities.[5]

The Parties' submissions show the dispute is broader than that, however. To support their motions, Webco and Custom Chemical introduced affidavits tending to show that neither organization has had meaningful contacts with Minnesota. *See* ECF Nos. 79, 90. In response, Ecolab filed materials it says show that Webco and Custom Chemical have had sufficient contacts with Minnesota to justify the exercise of personal jurisdiction over both organizations under a typical "minimum contacts" analysis. *See* ECF Nos. 99, 100, 102, 103, 107, 108. Webco and Custom Chemical replied and filed additional materials. *See* ECF Nos. 110, 111, 118, 119. And Ecolab responded with a supplemental declaration and additional materials. *See* ECF Nos. 129, 130. Described at a high level, Ecolab's materials focus on Webco and Custom Chemical's obligations and performance under the Agreement and their communications and commercial interactions with Ecolab. Ecolab's materials also focus on the occasional presence of Webco's agents in Minnesota, though Ecolab has not submitted comparable materials with respect to Custom Chemical.

Answering the personal-jurisdiction question here thus begins with a typical minimum-contacts analysis. If that analysis does not show the presence of personal

---

[5]     Ecolab's allegation that there is "*at least* specific personal jurisdiction over Webco and Custom Chemical," Am. Compl. ¶ 14 (emphasis added), seems like an effort to hold the door open for an argument that there is general personal jurisdiction over one or both organizations. A court may exercise general personal jurisdiction only when a defendant is "essentially at home" in the court's jurisdiction—here, Minnesota. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. ---, 141 S. Ct. 1017, 1024 (2021) (quotation omitted). The Amended Complaint, the evidentiary record, and the Parties' briefs give no hint that Webco or Custom Chemical might conceivably be at home in Minnesota.

jurisdiction over Webco or Custom Chemical, it will be necessary to apply the *Calder* effects test.  The upshot is that Webco and Custom Chemical's motions must be granted unless the Parties' submissions—construed in a light most favorable to Ecolab—show that Webco and Custom Chemical's actions created a substantial connection with Minnesota and provided fair warning to Webco and Custom Chemical that they may be subject to jurisdiction here.  *Burger King Corp.*, 471 U.S. at 472–73; *Creative Calling Sols.*, 799 F.3d at 979–80.

1

(a) On this record, Webco's Minnesota contacts cannot reasonably be construed to possess a nature or quality sufficient to support the exercise of personal jurisdiction over Webco in Minnesota.  Consider in turn each of the contacts or categories of evidence Ecolab relies on to show personal jurisdiction.

(i) "[C]ontinuing [contractual] relationships and obligations with citizens of another state[]" are relevant to the personal-jurisdiction analysis, *Burger King Corp.*, 471 U.S. at 473, so Ecolab understandably points out that the Agreement contemplated that Webco— as a "third party manufacturer" for IBA—would "agree to the same manufacturing, non-compete and confidentiality provisions as agreed by IBA."  ECF No. 61-1 ¶ 2.5.  The Agreement is not explicit about whether obtaining a third-party manufacturer's agreement to these terms was Ecolab or IBA's responsibility.  Regardless, Webco was not a party to the Agreement, and the record contains no evidence permitting the reasonable inference that Webco ever assented to these terms.  In a declaration, Webco's President, Mark Puliafico, testified that he is "not aware of any written agreement between Webco and

10

[Ecolab]."   ECF No. 110 ¶ 4.   Ecolab has neither filed nor alleged the existence of an

agreement that might contradict or undermine this testimony.   And Ecolab did not sue

Webco (or Custom Chemical) for breach of contract—just IBA.   Am. Compl. ¶¶ 36–53.

As Webco describes its arrangement with IBA, IBA "either picks up the products at

Webco's facility or Webco ships the products by common carrier FOB Dudley,

Massachusetts so title passes in Massachusetts."   ECF No. 79 ¶ 8.   In other words, Webco

has introduced evidence that it does not ship product to Ecolab in Minnesota.   Ecolab has

identified no contradictory evidence.   This record cannot reasonably be construed to show

either that Webco accepted contractual obligations running to Ecolab by virtue of the

Agreement between Ecolab and IBA or that Webco had some other contractual relationship

with Ecolab.[6]

(ii) Ecolab asserts that it "directly provide[d] Webco with technical information and

trade secrets pursuant to the License Agreement."   ECF No. 98 at 8–9.   To support this

assertion, Ecolab cites an email thread dated September 12, 2008, between an Ecolab

---

[6]      Ecolab cites *Allina Health System v. Gentox Medical Services, LLC*, to support its
contention that Webco need not have negotiated or been a party to the Agreement to be
bound by it, but the case is distinguishable.   No. 22-cv-63 (NEB/JFD), 2022 WL 3647822,
at *1 (D. Minn. Aug. 24, 2022).   There, Allina purchased 15 million pairs of nitrile gloves
from Gentox that were never delivered.   Allina sued Gentox for breach of contract and sued
Kennedy, Gentox's sole member, for fraud and theft.   Allina also sought to pierce the
corporate veil to find Kennedy liable for claims against Gentox.   Throughout the parties'
dealings, Kennedy had emailed Allina falsely claiming Allina had not made its payments,
that Gentox had contacted the "US Department of Foreign Commerce" about delivery
issues, and that shipments would arrive soon.   Judge Brasel found that, although Kennedy
did not negotiate with Allina for the actual glove sales, Kennedy's contacts with Allina "on
numerous occasions over an extended amount of time" to further the allegedly fraudulent
transaction were enough to justify the exercise of personal jurisdiction over Kennedy.   *Id.*
at *3.   The record here does not show similar contacts.

employee then-located in Redmond, Washington, and Webco in Massachusetts regarding "new product information" and "shar[ing] formulation, specifications, and QATMs." *See* ECF Nos. 100–100-5.  This email thread does not reasonably imply the presence of personal jurisdiction over Webco in Minnesota in 2023.  The email thread has no explicit Minnesota connection.  As just described, the emails were exchanged between an Ecolab employee in Washington and Webco in Massachusetts.  *See* ECF No. 100.  It is true that Ecolab is headquartered in Minnesota.  But what matters is whether Webco possessed a deliberate, substantial connection with Minnesota, and it is difficult to understand how that connection is established when the relied-on communications did not occur in or emanate from Minnesota, or describe dealings that took place or might take place in Minnesota.  *Cf. SFC Glob. Supply Chain, Inc. v. DNO, Inc.*, No. 21-cv-914 (ECT/TNL), 2021 WL 3173703, at *5 (D. Minn. July 27, 2021) (noting that in "cases where a non-forum defendant contracted with an in-forum plaintiff to undertake obligations in locations other than the forum state . . . [the] relationship often lacks the qualities necessary to show that a non-forum defendant possessed a substantial connection with the forum state that, in turn, warrants personal jurisdiction") (citing cases).  And the emails are fifteen years old, prompting significant doubt about their relevance to showing personal jurisdiction in a case brought against Webco in 2023.

(iii) Ecolab asserts that "Webco engaged with Ecolab regularly by purchasing raw materials from Ecolab for 'many, many years' that Webco used to manufacture" external udder care products during the Agreement's term.  ECF No. 98 at 9.  As support for this assertion, Ecolab cites an email thread that began August 29, 2018, and concluded roughly

one week later on September 5.  ECF No. 100-10.  The email thread concerns Ecolab's role in supplying a raw material—mandelic acid—to IBA, Webco, and Custom Chemical.  The thread begins with an exchange between Custom Chemical and Ecolab regarding a September 4 mandelic acid delivery to Custom Chemical.  *See id.* at 5–8.  From that point, the thread consists of emails between just Ecolab personnel discussing how Webco and Custom Chemical might obtain mandelic acid going forward.  *See id.* at 2–5.  Emails in the thread assert that Webco (and Custom Chemical) had purchased mandelic acid from Ecolab for a lengthy period.  *See id.* at 5 (asserting that Webco and Custom Chemical had purchased the material "from us . . . for many, many years"); *id.* at 2 (asserting that "we have been supplying Webco and Custom Chemical with Mandelic acid since [Ecolab] bought Alcide back in 2004").  It would be a mistake to give this email thread considerable weight.  The thread is indefinite in important ways.  It does not say how often Ecolab supplied the material during this time, or how much.  It does not say, for example, whether Ecolab was the exclusive or primary supplier of mandelic acid to Webco during this time.  It does not say whether Ecolab and Webco contracted for this arrangement.  (One email references the product being supplied to Webco as part of "the renewal process with IBA." *Id.* at 3.)  The thread does not identify a state from which the product was shipped to Webco.  One email references connecting Webco with Ecolab's supplier, suggesting that Ecolab may have facilitated a supply arrangement from a third party, but neither the third party nor its location are identified.  *Id.* at 5.  And it seems reasonable to question why—if the Ecolab/Webco mandelic acid supply relationship was direct, enduring, and substantial—this email thread is Ecolab's only evidence of the relationship.  Construed in

a light most favorable to Ecolab, the email thread does not show the presence of Minnesota contacts that might trigger personal jurisdiction over Webco.

(iv) Ecolab asserts that Webco representatives met with Ecolab and attended industry conferences in Minnesota.  ECF No. 98 at 9.  To support this assertion, Ecolab cites an internal Ecolab email in which one Ecolab employee asks another to "send a [calendar] invite" to schedule a meeting with Webco's Mark Puliafico in October 2016.  ECF 100-8 at 2.  Ecolab also cites materials including notices, schedules, and a presentation, all concerning IBA-sponsored regional meetings in Minnesota.  *See* ECF Nos. 102, 103–103-4.  These documents do not provide material assistance in ascertaining the nature and quality of Webco's Minnesota contacts.  The "calendar invite" email says nothing about whether the meeting occurred or what subjects the meeting might have concerned.  ECF No. 100-8.  Though the undisputed testimony of Ecolab employee Greg Stumpf shows that Mr. Puliafico and other Webco representatives attended annual IBA-sponsored meetings in Minnesota, this evidence does not connect attendance at those meetings to the issues in this case.  *See* ECF No. 102 ¶¶ 5, 9; ECF Nos. 103–103-4.  The October 2017 meeting program describes an array of topics relevant to the dairy industry beyond teat dip.  *See* ECF No. 103-1.  These included, for example, robotic milking, future market conditions, and hoof treatments.  *Id.*  Ecolab does not describe the nature or quality of these meetings in a way that might permit an inference justifying personal jurisdiction over Webco.

(b) The record cannot reasonably be construed to show that Webco has a substantial number of Minnesota contacts.  To show that the quantity of Webco's contacts supports

the exercise of personal jurisdiction, Ecolab relies on much of the same evidence just discussed.  Relying on the 2008 email thread originating from the Ecolab employee in Washington state, ECF Nos. 100–100-7,  Ecolab argues that "[e]ach time Ecolab supplied information or materials to Webco, Webco created a contact with Minnesota," ECF No. 98 at 9.  Not so.  The relied-on email thread evidences no particular Minnesota connection.  If there is other evidence showing that Ecolab supplied information or materials to Webco from Minnesota (or the frequency with which that occurred), it is not in the record.  Ecolab argues that "each time Webco corresponded with an Ecolab employee, this too created additional contacts with Minnesota."  *Id.*  Fair enough, provided one assumes that the correspondence is with a Minnesota-based Ecolab employee.  But Ecolab cites only one email thread to support this assertion.  *Id.* (citing ECF No. 100-7).  It would not be reasonable to infer some substantial number of Webco-Minnesota contacts based on this email.  And Ecolab argues that "Webco's physical presence in Minnesota on various occasions created physical contacts with Minnesota."  *Id.* at 10.  To support this assertion, Ecolab points to Webco's attendance at the IBA-sponsored meetings.  *Id.*  This evidence, however, is not specific regarding the number of such contacts.  It consists largely of meeting notices, registration forms, and an Ecolab PowerPoint slide presentation that say nothing about Webco's attendance, or the frequency of Webco's attendance, at these meetings.  *See* ECF Nos. 103, 103-2–103-4.  The single program in the record shows that Mr. Puliafico attended the October 2017 meeting, ECF No. 103-1, but that is one meeting.  Mr. Stumpf's declaration testimony is not specific.  It says only that Webco "regularly attended" IBA-sponsored meetings in Minnesota.  ECF No. 102 ¶ 9.  We are not told how

many times a Webco representative attended those meetings.  It would be unreasonable to infer some personal-jurisdiction-favoring number of contacts from this general assertion.

(c) A substantial relationship between Ecolab's trade-secret causes of action and Webco's limited Minnesota contacts is not apparent.   Ecolab argues that a personal-jurisdiction-supporting relationship exists because Webco's decision to manufacture products under the Agreement gave Webco access to Ecolab's trade secrets that, in turn, enabled it "to exploit Ecolab's trade secrets and to continue using Ecolab's trade secrets following termination of the License Agreement."  ECF No. 98 at 10.  This argument explains how Webco gained access to Ecolab's alleged trade secrets.  It draws no particular link between Webco's Minnesota contacts and Webco's access to this information other than Ecolab's Minnesota presence.  More importantly, in the Amended Complaint, Ecolab focuses its trade-secret claims on Webco's "continued use" of Ecolab's trade secrets to manufacture products after the Agreement's termination.  *See* Am. Compl. ¶¶ 66–70; 75.  Insofar as manufacturing is concerned, Webco asserts that this occurs "exclusively" in Massachusetts, and Ecolab cites no contrary evidence.  ECF No. 79 ¶ 5. Ecolab does not seem to allege, and has identified no record evidence to show, that Webco's assertedly unlawful conduct occurred anywhere but Massachusetts.

(d) and (e) "[T]he better understanding of the Eighth Circuit's statements that the last two factors are 'not determinative' or 'not dispositive' is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with the forum." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 534 n.3 (D. Minn. 2021).  If they could affect the outcome, the last two factors do not favor personal

jurisdiction so strongly as to overcome the absence of a substantial connection between Webco and Minnesota. As is usually the case, measuring Minnesota's interest in providing a forum for Ecolab is an inexact science. Obviously, Ecolab maintains its principal place of business in Minnesota, Am. Compl. ¶¶ 1–2, and Minnesota has an interest in providing a litigation forum for Ecolab. *See K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 595 (8th Cir. 2011). There are good reasons to think that interest may not be so strong when, as here, the litigation-provoking activities occurred in another state. Regardless, whatever its precise extent here, Minnesota's interest "cannot make up for the absence of minimum contacts." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996). Again, if it could affect the outcome, the convenience to the Parties of a Minnesota forum does not justify concluding there is personal jurisdiction over Webco. No doubt Minnesota is a convenient forum for Ecolab, but it is not obvious that Minnesota is convenient for Ecolab in every respect. As pleaded, Webco's trade-secret violations occurred at its Massachusetts facility. It seems reasonable to predict that discovery must occur there, and important trial witnesses and exhibits will come from there. Minnesota is not a convenient forum for Webco.

(f) The *Calder* "effects test" is an "additional factor" to be considered in intentional-tort cases. *Kendall Hunt Publ'g Co. v. The Learning Tree Publ'g Corp.*, 74 F.4th 928, 931 (8th Cir. 2023). As our Eighth Circuit Court of Appeals has described it, the *Calder* effects test requires a plaintiff to show the presence of three elements: (1) that a defendant's acts were intentional; (2) that the acts "were uniquely or expressly aimed at the forum state"; and (3) that the acts "caused harm, the brunt of which was suffered—and

which the defendant knew likely was to be suffered—[in the forum state]." *Kendall Hunt Publ'g Co.*, 74 F.4th at 931 (quoting *Brothers and Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir. 2022)).  The Eighth Circuit "construe[s] the *Calder* effects test narrowly" in the sense that "mere effects in the forum state are insufficient to confer personal jurisdiction." *Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010).

(i) As alleged here, Ecolab's trade-secret claims fall in the intentional-tort category and satisfy the first *Calder* element.  Ecolab alleges factually that Webco's (and Custom Chemical's) trade-secret misappropriation was done "maliciously and willfully."  Am. Compl. ¶¶ 71, 76.  This allegation seems very likely to be disputed down the road, but Webco does not challenge the allegation as part of its motion.  And other courts have found as a legal matter that trade-secret claims are intentional torts for purposes of applying *Calder*'s effects test.  *See Coronacide, LLC v. Wellness Matrix Grp., Inc.*, No. 8:20-cv-00816-CEH-AAS, 2021 WL 1060356, at *7 (M.D. Fla. Mar. 19, 2021) ("In applying the 'effects' test, courts have previously found Lanham Act unfair competition claims and Florida Deceptive and Unfair Trade Practices Act claims to constitute intentional torts based on the allegations of the operative complaints."); *see also Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 360 (D.N.J. 2019) (holding that claims under DTSA and New Jersey state analog were intentional torts).

(ii) The second *Calder* element requires that a defendant deliberately create "contacts with the forum State itself," not merely "contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or

other parties.  But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Id.* at 286; *see also WTAS, LLC v. West Tennessee Air Serv., LLC*, No. 23-cv-2015 CJW-MAR, 2023 WL 3778716, at **4, 6–7 (N.D. Iowa Apr. 24, 2023).  Ecolab has not shown that Webco deliberately created Minnesota contacts to carry out the alleged trade-secret misappropriation.  The primary allegation supporting these claims seems to be that Webco continued manufacturing acidified sodium chloride teat-dip products using Ecolab's trade secrets after the Agreement's expiration.  But Webco's manufacturing activities occurred exclusively in Massachusetts.  If Ecolab means to allege that Webco's misappropriation went beyond manufacturing—to marketing or selling the products, for example—the record still does not show that Webco deliberately created contacts with Minnesota.  No evidence shows that Webco marketed or sold acidified sodium chloride teat-dip products in Minnesota or anywhere else.  To summarize then, the record cannot reasonably be construed to show that Webco's misappropriation-directed activities "were uniquely or expressly aimed" at Minnesota. *Kendall Hunt Publ'g Co.*, 74 F.4th at 931.

(iii) All that remains is Ecolab's Minnesota presence and its claim to have been injured there, but the Supreme Court has made clear that a plaintiff's in-forum presence and injury cannot alone make the exercise of personal jurisdiction appropriate.  *Walden*, 571 U.S. at 290 ("[M]ere injury to a forum resident is not a sufficient connection to the forum."); *see id.* at 285 ("[H]owever significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980))).

The bottom line is that Webco's motion will be granted because the record evidence, construed in a light most favorable to Ecolab, does not show that Webco's actions created a substantial connection with Minnesota and provided fair warning to Webco that it might be subject to jurisdiction here.

2

(a) On this record, Custom Chemical's Minnesota contacts cannot reasonably be construed to possess a nature or quality sufficient to support the exercise of personal jurisdiction over Custom Chemical in Minnesota.

(i) As with Webco, Ecolab argues that "Custom Chemical had contacts with Minnesota through its decision to accept and use Ecolab's technical information and trade secrets under Sections 2.1 and 2.5 of the License Agreement." ECF No. 106 at 10. And as with Webco, this is not persuasive. Custom Chemical was not a party to the Agreement. The record contains no evidence permitting the reasonable inference that Custom Chemical assented to these terms. In a declaration, Custom Chemical's President and CEO, Scott Von Luft, testified that the organization "do[es] not have any known contracts with any Minnesota companies or residents." ECF No. 90 ¶ 3. To the extent this statement was intended to refer to the Agreement, Ecolab does not seem to dispute it. Again, Ecolab did not sue Custom Chemical on its breach-of-contract claim. *See* Am. Compl. ¶¶ 36–53. Though Mr. Von Luft testified that Custom Chemical "does manufacture and sell . . . teat dip . . . for IBA, Inc., at [Custom Chemical's] California facilities," he also explained that Custom Chemical "ha[s] never shipped (currently or historically) any of IBA's teat dips to Minnesota." ECF No. 90 ¶ 4. Mr. Von Luft also explained that Custom Chemical "ha[s]

a limited geographic distribution of any shipments" for IBA, and that this limited territory does not include Minnesota. *Id.* Ecolab has identified no contradictory evidence.[7] This record cannot reasonably be construed to show that Custom Chemical accepted continuing contractual obligations running to Ecolab by virtue of the Ecolab/IBA Agreement.

(ii) Ecolab asserts that it supplied raw materials to Custom Chemical "from as early as 2011" continuously through 2021 and that this "demonstrates an 'ongoing business relationship' between Custom Chemical and Ecolab, which this Court has recognized gives rise to personal jurisdiction." ECF No. 106 at 10 (quoting *Cortec Corp. v. Corpac GMBH & Co, KG*, No. 22-cv-476 (KMM/ECW), 2023 WL 171791, at *6 (D. Minn. Jan. 12, 2023)). To support this assertion, Ecolab cites a series of email exchanges between Custom Chemical and Ecolab representatives regarding Custom Chemical's acquisition of mandelic acid. *See* ECF Nos. 108–108-12. These email exchanges occurred between October 2017 and October 2021. *See id.* Each email thread begins with a Custom Chemical representative requesting Ecolab's assistance procuring mandelic acid and continues with further communication regarding the request. *See id.* At least several of the Ecolab employees who appear in these communications were in Minnesota. *See, e.g.*, ECF No. 108-6 at 7. One message includes a chart displaying Custom Chemical's purchase history. ECF No. 108-6 at 9. The chart indicates that, between October 2011 and June

---

[7]    Ecolab filed one email in which an Ecolab employee described receiving a call from a Custom Chemical representative inquiring whether "Ecolab would have any need for a[n] outsource manufacturer or blender for products on the west coast." ECF No. 108-16 at 2. Ecolab does not seem to contend, and no record evidence suggests, that any direct business or contractual relationship between Ecolab and Custom Chemical resulted from these communications.

2017, Custom Chemical purchased mandelic acid from Ecolab on sixteen occasions.  *Id.*
Though it is a somewhat closer call, I conclude that this evidence does not reasonably imply
the presence of personal jurisdiction over Custom Chemical in Minnesota.  The email
communications cannot reasonably be construed to show the presence of an ongoing
contractual relationship.  They reflect intermittent transactions, several arising from supply
challenges faced by Custom Chemical.  *See, e.g.*, ECF Nos. 108 at 5 (referring to Custom
Chemical "supply challenge"); 108-2 at 2 (asking whether Custom Chemical would be
ordering from Ecolab in the future); 108-3 at 2 (referring to Custom Chemical's lack of
mandelic acid as an "urgent situation" that Ecolab was not able to fill); 108-6 at 6
(suggesting that, due to Ecolab's mandelic acid supply delays, Custom Chemical "may
want to go directly to a commodities broker to get this").[8]  And apart from email
communications, the record does not show that these transactions had a Minnesota
connection.  Purchase orders filed by Ecolab show that the product was shipped to Custom
Chemical at its California location from Pasadena, California.  *See* ECF Nos. 108-5 at 2,
108-12 at 2; *see SFC Glob. Supply Chain, Inc. v. DNO, Inc.*, No. 21-cv-914 (ECT/TNL),
2021 WL 3173703, at *5 (D. Minn. July 27, 2021).

---

[8]       The case Ecolab cites, *Cortec Corp.*, supports this conclusion.  There, the "lengthy,
ongoing business relationship" that prompted Judge Menendez to find personal jurisdiction
over a German-based defendant, Corpac, was a nearly-two-decades long distribution
agreement between it and a Minnesota corporation, Cortec.  2023 WL 171791, at *6.
Among other terms, the agreement "designate[d] Minnesota as the venue for resolution of
disputes arising out of or relating to the agreement, and it select[ed] Minnesota law as the
substantive law to govern any dispute."  *Id.*  The agreement led to Corpac "purchasing over
$20 million of Cortec's product during that period."  *Id.*  The record here cannot reasonably
be understood to show that Ecolab and Custom Chemical had any relationship like that.

(b) Relative to the totality of the circumstances, it would be a mistake to find that Custom Chemical had a substantial number of Minnesota contacts. To show that the quantity of Custom Chemical's contacts supports the exercise of personal jurisdiction, Ecolab relies on the same evidence just discussed. ECF No. 106 at 11. In terms of quantity, that evidence consists of some sixteen email threads spanning May 2016 to October 2021. *See* ECF Nos. 108–108-12. To put things in context, that represents a thread of email communication between Ecolab and Custom Chemical about once every four months. Those numbers do not seem substantial. And there isn't anything else. Mr. Von Luft testified in his declaration that Custom Chemical has no Minnesota connections and that he "ha[s] never been to Minnesota either for work or pleasure" and that he is "not aware of any other persons at Custom Chemical who have travelled to Minnesota for work, either." ECF No. 90 ¶ 3. Ecolab has introduced no contrary evidence. It appears essentially to concede the point in its brief when it argues only that Custom Chemical's lack of in-person contacts at "Ecolab's Minnesota location is not dispositive." ECF No. 106 at 11.

(c) A substantial relationship between Ecolab's trade-secret causes of action and Webco's limited Minnesota contacts is not apparent. Ecolab argues that its "claims of trade secret misappropriation arise directly out of Custom Chemical's contacts with Minnesota." *Id.* It says that Custom Chemical "created contacts with Ecolab and Minnesota" through its IBA manufacturing relationship, its communications with Ecolab, its purchase of mandelic acid from Ecolab, "and by requesting confidential information from Ecolab." *Id.*

23

at 11–12.[9]  Apart from the email communications discussed above, Ecolab does not identify what other Custom Chemical-Minnesota contacts resulted from the Custom Chemical/IBA relationship.   Regardless, this case does not concern Custom Chemical's *purchase* of mandelic acid.   It concerns Custom Chemical's *use* of the product—among other products—to misappropriate Ecolab's trade secrets.  In other words, Ecolab's trade-secret claims do not depend on the identity of Custom Chemical's mandelic acid supply source or whether that source is in Minnesota or any other state.  The claims turn on what Custom Chemical did with the product and any confidential or trade-secret information it received. Ecolab does not seem to allege, and has identified no record evidence to show, that Custom Chemical's assertedly unlawful conduct occurred anywhere but California and perhaps other states, but not in Minnesota.

(d), (e), and (f) The analysis regarding the final three factors—Minnesota's interest in providing Ecolab a forum, the convenience to the parties of a Minnesota forum, and *Calder*'s effects test—do not change from Webco to Custom Chemical.  *See supra* at 16–19.  Substitute "Custom Chemical" for "Webco" and "California" for "Massachusetts," and the analysis is the same.  And, as with Webco, Custom Chemical's motion will be granted because the record evidence, construed in a light most favorable to Ecolab, does not show that Custom Chemical's actions created a substantial connection with Minnesota and provided fair warning to Custom Chemical that it might be subject to jurisdiction here.

---

[9]      To support its assertion that Custom Chemical "request[ed] confidential information from Ecolab," Ecolab cites two email threads, ECF Nos. 108-13 and 108-14.  The Ecolab employee who sent the requested information in these two threads was located in Redmond, Washington.  *Compare id. with* ECF No. 100 at 2–3.

24

C

In the concluding sections of its briefs opposing Webco and Custom Chemical's motions, Ecolab requests: "To the extent the Court deems the current record insufficient to support personal jurisdiction over [either Defendant], Ecolab asks that the Court permit it jurisdictional discovery and the opportunity to supplement the record before deciding the Motion to Dismiss."  ECF No. 98 at 17; ECF No. 106 at 21.

This request will be denied.  As a matter of sound case administration, the better time to request jurisdictional discovery is before a Rule 12(b)(1) or 12(b)(2) motion has been fully briefed and argued.  *See, e.g.*, *Randall v. Greatbanc Tr. Co.*, No. 22-cv-2354 (ECT/DJF), 2023 WL 2662676, at **1–2 (D. Minn. Mar. 28, 2023); *Yellow Brick Road, LLC v. Koster*, No. 13-cv-2266 (JRT/LIB), 2014 WL 12932224, at **2–4 (D. Minn. Feb. 25, 2014).  Though Defendants moved to stay discovery pending a decision on their dismissal motions, Ecolab did not raise its need for jurisdictional discovery as a basis for opposing that motion.  *See generally* ECF No. 140.  And given Ecolab's claims and personal-jurisdiction theories, it is difficult to understand what particular information Ecolab might reasonably expect to need that would not be in its possession already.  For example, at the hearing on these motions, Ecolab described the relationship between it and Defendants as a "joint enterprise."  *See, e.g.*, ECF No. 145 at 16, 22, 38, 41.  If that were true, then one would reasonably expect Ecolab—by virtue of its participation in the enterprise—to have possessed a significant volume of information regarding IBA, Webco, and Custom Chemical's activities, including their Minnesota-based or Minnesota-directed activities.  In other words, as Ecolab has presented the case, this is not a circumstance

where information essential to the personal-jurisdiction inquiry is exclusively in the moving parties' possession.

D

"When a federal district court determines it lacks personal jurisdiction over defendants and the 'plaintiff seriously intends to press [its] claim,' the result should be an order transferring the case to an appropriate judicial district rather than outright dismissal." *Ready 4 A Change, LLC v. Sourcis, Inc.*, No. 18-cv-1341 (ECT/ECW), 2019 WL 252028, at *5 (D. Minn. Jan. 17, 2019) (quoting *Thompson v. Ecological Sci. Corp.*, 421 F.2d 467, 470 n.4 (8th Cir. 1970)); *see also SFC Glob. Supply Chain v. DNO, Inc.*, No. 21-cv-914 (ECT/TNL), 2021 WL 3173703, at *6 (D. Minn. July 27, 2021).  Here, because Ecolab has not requested transfer, the case will be dismissed outright as to Webco and Custom Chemical, giving Ecolab the opportunity to appeal or proceed to file its claims against Webco and Custom Chemical in a different, appropriate forum.

III

Pursuant to Rule 5.2(e), Ecolab has "move[d] to redact select portions from the . . . hearing transcript referencing Ecolab's trade secret and confidential and proprietary information."  ECF No. 157.  The information Ecolab seeks to have redacted includes any mention of a raw material used in the manufacture of its teat-dip products.  *See* ECF No. 159.  Defendants oppose the motion.  *See* ECF Nos. 164, 165.

Rule 5.2 provides, in relevant part, that "[f]or good cause, the court may by order in a case . . . require redaction of additional information."  Fed. R. Civ. P. 5.2(e).  I understand the good-cause standard to require Ecolab to demonstrate some adverse

consequence that may result from the public disclosure of the information it seeks to redact, accounting also for the public's right of access to judicial proceedings.  *See Keefe v. City of Minneapolis*, No. 09-cv-2941 (DSD/SER), 2014 WL 1805398, at *2 (D. Minn. May 7, 2014).

Ecolab's motion to redact the hearing transcript will be denied.  At the hearing on these motions—which no party requested be closed to the public—Ecolab provided a high-level but reasonably precise description of the at-issue trade secrets:

> [M]andelic acid is known.  Teat dips are known.  These are all true facts. . . . But that's not what this case is about.
>
> This case is about specific trade secrets that go to specific information about the quality of raw materials, the test methods to use on raw materials, and the tiny differences between those when they are in and out of spec that can really impact the manufacturing, cause separation problems, cause all kinds of issues.  The trade secrets that we're talking about are the details of all of how this is done; and all of that was developed by Ecolab, shared with Webco under the understanding that they were bound by this confidentiality agreement.

ECF No. 145 at 18–19.  A careful, line-by-line review of the transcript shows that neither these specific details nor information from which these specific details might be reverse-engineered was discussed at the hearing (or appears on the transcript).  And mention of publicly known materials during the hearing—and before the hearing in Defendants' various unsealed submissions—prompted no objection or contemporaneous sealing request.  This denial is without prejudice to Ecolab's right to request that specific filed exhibits remain sealed or to seek a protective order that might govern the case more broadly going forward.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant Webco Chemical Corporation's Motion to Dismiss [ECF No. 76] is **GRANTED.**

2.    Defendant Custom Chemical Formulators, Inc.'s Motion to Dismiss [ECF No. 85] is **GRANTED in part** and **DENIED in part as moot**.

3.    Plaintiffs' claims, to the extent they are asserted against Webco and Custom Chemical, are **DISMISSED WITHOUT PREJUDICE**.

4.    Ecolab's Motion to Redact the August 7, 2023 Hearing Transcript [ECF No. 157] is **DENIED**.


Dated:  October 26, 2023                                s/ Eric C. Tostrud
                                                                        Eric C. Tostrud
                                                                        United States District Court