UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Ecolab Inc., and Ecolab USA Inc., | File No. 22-cv-479 (ECT/DTS) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| IBA, Inc., | |
| Defendant. | |

---

Rachel Zimmerman Scobie, Paige S. Stradley, Gabrielle Kiefer, and Anneliese S. Mayer, Merchant & Gould P.C., Minneapolis, MN, for Plaintiffs Ecolab Inc. and Ecolab USA Inc.

Caitlinrose H. Fisher and Robert J. Gilbertson, Forsgren Fisher McCalmont DeMarea Tysver LLP, Minneapolis, MN, for Defendant IBA, Inc.

---

Plaintiffs—who, following their lead, will be referred to collectively as "Ecolab"—moved to compel discovery from Defendant IBA. Magistrate Judge David T. Schultz gave Ecolab some of the discovery it wanted, but not everything.

One category of discovery Ecolab wanted but did not get concerned IBA's alleged use of Ecolab's trade secrets to develop and manufacture non-Ecolab-branded acidified sodium chlorite (or "ASC") bovine teat-dip products.[1] IBA obtained Ecolab's trade secrets

---

[1] These products are applied to the teats of lactating cows to control the spread of mastitis. "Bovine mastitis is an inflammation of the mammary gland caused from trauma or an infection, leading to abnormal and decreased milk production." *Bovine Mastitis*, Cornell University College of Veterinary Medicine, https://www.vet.cornell.edu/departments-centers-and-institutes/baker-institute/our-research/bovine-mastitis (last visited July 17, 2024).

under a license agreement ("Agreement") that authorized IBA to manufacture and market Ecolab-branded products. Ecolab believes it asserted breach-of-contract and trade-secret claims arising from IBA's development and manufacture of IBA's own competing products, and Ecolab wanted to know how IBA produced these products. Judge Schultz denied Ecolab's request for this information because, among other reasons, he determined that Ecolab's operative Amended Complaint asserts no claim based on IBA's use of Ecolab's trade secrets to develop or manufacture IBA's products. Ecolab objects to this aspect of Judge Schultz's order.

A second category of discovery Ecolab wanted but did not get concerned IBA's marketing and sale of IBA's products after January 6, 2022. Ecolab claimed that IBA's ongoing marketing and sales of these products breached provisions in the Agreement that survived the Agreement's termination, and Ecolab wanted to know the extent of the breach. Judge Schultz denied Ecolab's request for this information on the legal conclusion that the claim-supporting contract provision did not survive the Agreement's termination. Ecolab objects to this legal conclusion.

Ecolab's objection to Judge Schultz's decision on the first category will be overruled. The better answer—and the one Judge Schultz reached—is that the Amended Complaint does not assert a claim based on IBA's development or manufacture of its own teat-dip products. Without that claim, the discovery Ecolab seeks seems irrelevant; it is at least disproportional to the case's needs. Ecolab's objection to Judge Schultz's decision on the second category will be sustained. Judge Schultz's take on the legal issue is certainly reasonable, and it may turn out to be correct. The difficulty is that the issue has not been

2

briefed or presented in a way that reasonably permits resolution of the dispositive contract-interpretation issue once and for all in the context of this discovery dispute.

I

BACKGROUND FACTS AND ECOLAB'S CLAIMS

*Ecolab's predecessor in interest, Alcide Corporation, and IBA executed a license agreement.* *See* ECF No. 61-1 ("Agreement"). The Agreement is dated April 26, 2002. *Id.* At that time, Alcide possessed intellectual property "and information relating to products intended for use in the prevention of mastitis in dairy cattle." *Id.* at 2, ¶ A.[2] Under the Agreement, Alcide granted IBA "a non-exclusive license . . . to make, have made, use, sell and import" "external udder care products" in consideration for a licensing fee to be paid by IBA. *Id.* ¶¶ 2.1 (granting non-exclusive license in "the Product"); 1.2 (defining "Product" to mean "Alcide® external udder care products"); 3.1 (describing licensing fee). The Agreement originally had a five-year term. *Id.* ¶ 1.1. During that term, the Agreement forbade IBA from manufacturing or marketing "an acidified sodium chlorite teat dip product other than" Alcide's products.[3] *Id.* ¶ 2.5b; *see id.* ¶ 2.1 (prohibiting IBA from manufacturing external udder care products "for a third party"). And in the Agreement, IBA "covenant[ed] that it [would] advise Alcide one year in advance of the set termination

---

[2]  Page citations are to CM/ECF pagination appearing in a document's upper right corner, not to a document's original pagination.

[3]  As I understand it, the parties use the term "Covered Products" to refer to Ecolab-branded teat-dip products manufactured or marketed pursuant to the Agreement during and after the Agreement's term (whatever that term might be). The parties use the term "Non-Covered Products" to refer to IBA's own non-Ecolab-branded teat-dip products. For precision's sake, this order does not follow this convention.

3

date of this Agreement of its intention to market an acidified sodium chlorite teat dip product." *Id.* ¶ 2.5b.  The Agreement included a confidentiality provision governing each party's handling of the other's confidential information.  *See id.* ¶ 7.  The confidentiality provision, among others, "survive[d] termination or expiration of" the Agreement, along with "any accrued obligations."  *Id.* ¶ 5.6.

*Ecolab succeeded Alcide, and Ecolab and IBA amended the Agreement.*  At some point between the Agreement's April 26, 2002 effective date and November 1, 2004, Ecolab became "the successor in interest by way of merger to Alcide."  ECF No. 61-2.  Following this merger, Ecolab and IBA executed four amendments to the Agreement.  As relevant here, the first amendment reflected the Ecolab/Alcide merger and extended the Agreement's term to May 31, 2009.  *Id.* at 2 (introductory paragraph) and ¶ 1.  The second amendment replaced Washington law with Minnesota's as the parties' choice of governing law and extended the Agreement's term to May 31, 2014.  ECF No. 61-3 ¶¶ 1, 3.9.11.  The third amendment extended the Agreement's term to May 31, 2019.  ECF No. 61-4 ¶ 2.  The fourth amendment addressed a license-fee-rebate provision that is not relevant to this specific discovery dispute.  ECF No. 61-5.

*Several core allegations underpin Ecolab's claims in the Amended Complaint.*  Ecolab alleges that "a vast quantity of technical information was disclosed by Alcide to IBA under the License Agreement, including, but not limited to trade secrets, technical reports, and proprietary data relating to formulations, test results, and manufacturing know-how."  Am. Compl. [ECF No. 61] ¶ 17.  Ecolab alleges the information Alcide disclosed was subject to the Agreement's confidentiality terms "which prevented IBA from

4

using any confidential, proprietary, or trade secret information disclosed by Alcide for any purpose other than fulfilling the relationship established by the License Agreement." *Id.* ¶ 18. Ecolab and IBA attempted without success to negotiate a formal extension of the Agreement beyond its termination date of May 31, 2019. *Id.* ¶ 27; *see* ECF No. 61-4 ¶ 2. After that date, "Ecolab continued to conform its conduct to the terms of the License Agreement," and IBA represented it was doing the same. Am. Compl. ¶¶ 28–29. Ecolab alleges that "by implication due to the parties' continued course of conduct," the Agreement was extended to January 6, 2022. *Id.* ¶ 39.

*Ecolab asserts a breach-of-contract claim. Id.* ¶¶ 36–53 (Count I). Ecolab alleges IBA breached the Agreement in five ways: (1) by "market[ing]" and "by selling or offering to sell" products that competed with Ecolab's products "during the implied-in-fact extension of the License Agreement," or between May 31, 2019 and January 6, 2022, *id.* ¶¶ 40–42; (2) by not notifying Ecolab one year before "of IBA's intent to market," and then by marketing, a teat-dip product that competed with Ecolab's products, *id.* ¶¶ 43–46; (3) by "having" Ecolab-branded products "made after the termination of the License Agreement," *id.* ¶ 49; (4) "by failing to return or destroy Ecolab's confidential information," *id.*; and (5) "by failing to ensure that its third party manufacturers returned or destroyed Ecolab's confidential information" or complied with other obligations the Agreement imposed on them, *id.* ¶ 50.

*Ecolab asserts a claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b).* Am. Compl. ¶¶ 54–73 (Count II). To support this claim, the Amended Complaint includes a series of allegations showing that the information Ecolab provided

5

to IBA included trade secrets. *Id.* ¶¶ 55–66. Ecolab then alleges two seemingly distinct DTSA theories. Ecolab's first theory is an alternative to its breach-of-contract claim. Ecolab alleges: "To the extent the term of the License Agreement was not extended as an implied in fact contract through January 6, 2022," IBA's continued use of Ecolab's trade secrets after the Agreement's May 31, 2019 termination date to "make and have made" Ecolab-branded products violated the DTSA. *Id.* ¶ 68. Ecolab's second DTSA theory is independent of the breach-of-contract claim. Ecolab alleges that IBA "continued to make or have made products incorporating" Ecolab's trade secrets after January 6, 2022. *Id.* ¶ 69.

*Ecolab asserts a claim under the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01–.08.* Am. Compl. ¶¶ 74–78 (Count III). The factual grounds for this claim appear identical to the grounds supporting Ecolab's DTSA claim. *Id.* ¶ 75 (relying on the "conduct set forth above" to show a MUTSA violation). If some distinct fact or facts support just this claim, Ecolab does not allege them.

*Ecolab asserts a trademark-infringement claim under the Lanham Act, 15 U.S.C. § 1114.* Am. Compl. ¶¶ 79–91. Again, Ecolab alleges two distinct trademark-infringement theories. The first is an alternative to Ecolab's breach-of-contract claim. To support this theory, Ecolab alleges: "Between at least June 1, 2019, and January 6, 2022, IBA continued to use" Ecolab's trademarks "on and in connection with the marketing and sale of" products. *Id.* ¶ 83. If the Agreement "was not extended as an implied in fact contract through January 6, 2022," then, Ecolab alleges, IBA's use of Ecolab's trademarks during this period violated the statute. *Id.* ¶ 84. Ecolab's second theory is that IBA used Ecolab's

6

trademarks after January 6, 2022, that this occurred without Ecolab's authorization, and that this violated the statute. *Id.* ¶¶ 85–86.

*Ecolab asserts unfair competition claims under the Lanham Act, 15 U.S.C. § 1125(a),* Am Compl. ¶¶ 92–102 (Count V), *and under Minnesota common law, id.* ¶¶ 103–05 (Count VI). These claims share essentially the same two theories behind Ecolab's trade-secret and trademark-infringement claims. The first theory assumes the Agreement "was not extended as an implied in fact contract through January 6, 2022," and alleges that IBA's use of Ecolab's trademarks during the June 1, 2019-to-January 6, 2022 period "in connection with the advertising, promotion, and/or sale of" Ecolab-branded products was "likely to cause confusion, to cause mistake, or to deceive as to source or origin among purchasers and/or users of such goods." *Id.* ¶ 94. The second theory relies on these same likelihood-of-confusion assertions but depends on IBA's alleged use of Ecolab's trademarks after January 6, 2022. *Id.* ¶¶ 95–96.

*Ecolab seeks various forms of relief.* Ecolab seeks an accounting, an order enjoining IBA "from marketing, advertising, or selling any . . . teat dip product for an appropriate period," an order requiring IBA to return Ecolab's confidential teat-dip-product information, and awards of damages, attorneys' fees and costs, and "such other further relief" as may be deemed "necessary and proper." *See id.* at 18–19, ¶¶ A–H.

II

PROCEDURAL HISTORY SPECIFIC TO THE DISCOVERY DISPUTE

*Ecolab obtained leave to amend its Complaint.* As Ecolab describes the situation, it learned in discovery that "following its termination of the implied-in-fact contract, IBA

7

continued to have products made using Ecolab's trade secret formulas and bearing Ecolab's trademarks." ECF No. 264 at 5. "Ecolab also learned that IBA had purportedly 'independently developed' and launched four new products very shortly after termination of the implied-in-fact contract." *Id.* These discoveries prompted Ecolab to seek leave to amend its original Complaint, *id.*, and Judge Schultz granted that motion, ECF No. 60. In Ecolab's understanding, the Amended Complaint added new factual grounds to Ecolab's breach-of-contract and trade-secret-misappropriation claims. These included allegations that IBA developed and manufactured Ecolab-branded teat-dip products after the Agreement's termination and allegations that IBA developed and manufactured its own teat-dip products—*i.e.*, products that did not bear Ecolab's trademarks and that competed with Ecolab's products. ECF No. 264 at 5.

*Ecolab sought discovery regarding IBA's development and manufacturing of non-Ecolab-branded teat-dip products.* IBA refused. Ecolab moved to compel this discovery. *See* ECF No. 173 at 18–25. IBA opposed the motion. *See* ECF No. 186 at 3–19. In its opposition brief, IBA summarized the basis for its opposition as follows:

> This Court should deny Ecolab's motion to compel information regarding the development and manufacture of Non-covered Products (*i.e.*, IBA's own, independently developed teat-dip products). This is a massively important issue to IBA. The Court should not allow Ecolab to use this lawsuit—a lawsuit about how and when IBA sold Ecolab's products ("Covered Products") and used Ecolab's trademarks—to fish for competitively sensitive information about completely different products that IBA developed independently after Ecolab told IBA that their business relationship had to come to an end. Ecolab never alleged, nor had any good-faith basis to allege, that these independently developed products made use of Ecolab's alleged trade secrets.

8

> Thus, the Court should not allow Ecolab to harass its now-competitor and help itself to detailed information about the independently developed products' development, formulation, customers, and sales.

*Id.* at 3–4.

*Judge Schultz denied Ecolab's motion to compel this discovery.* Judge Schultz held that "Ecolab is entitled to limited discovery regarding the marketing and sale of IBA's [non-Ecolab-branded products], but not to discovery regarding the development or manufacturing of such products." ECF No. 247 at 8. Judge Schultz identified multiple justifications for this decision. Chief among these was his conclusion that the Amended Complaint challenged only IBA's marketing and selling of non-Ecolab-branded products, not its manufacturing or development of them. *See id.* at 9 ("[T]he Amended Complaint's breach claim as pleaded only challenges IBA's marketing and selling of Non-Covered Products, not its manufacturing or developing of them."); 11 ("Ecolab's Amended Complaint only pleads misappropriation relative to Covered Products."). Judge Schultz identified other reasons, too. For example, everyone seems to agree that the original Complaint asserted no claim based on IBA's alleged development or manufacturing of non-Ecolab-branded products. Judge Schultz understood Ecolab to have represented in support of its motion for leave to file the Amended Complaint that the amended pleading added no new theories. It just expanded the temporal scope of claims asserted in the original Complaint. *See id.* at 11–12. Therefore, Judge Schultz concluded Ecolab was "judicially estopped" from arguing that the Amended Complaint could be construed to

9

advance this claim.  *Id.* at 12.  Ecolab objects to these conclusions.  *See* ECF No. 264 at 16–20.

*Ecolab sought discovery regarding IBA's post-termination marketing and sales of IBA's products.*  Ecolab's argument for this discovery proceeded in essentially four steps. (1) The Agreement prevented IBA from manufacturing or marketing its own teat-dip products during the Agreement's term and required IBA to give Ecolab one-year advance notice of IBA's intent to market its own teat-dip products.  ECF No. 61-1 ¶ 2.5b; *see* ECF No. 264 at 13.  (2) The one-year advance-notice covenant was an "accrued obligation" that survived the Agreement's termination.  Am. Compl. ¶ 44; *see* ECF No. 264 at 13. (3) IBA's ongoing sales through at least January 6, 2023, violated the covenant.  *See* Am. Compl. ¶ 46; *see also* ECF No. 264 at 14–15.  (4) Discovery of IBA's sales and marketing of its products is relevant to showing breach as to this claim.  ECF No. 264 at 15.

*Judge Schultz denied Ecolab's motion to compel this discovery during the period after January 6, 2022, following Ecolab's termination of the Agreement.*  Judge Schultz explained: "The . . . Agreement, the terms of which Ecolab asserts became the implied-in-fact agreement, did not provide for post-termination survival of the non-compete and notice provisions.  Therefore, even under Ecolab's theory of the case, IBA had no obligation to refrain from selling [IBA's products] as of January 6, 2022." ECF No. 247 at 10 n.6.  Ecolab objects to this conclusion.  *See* ECF No. 264 at 12–16.

10

III

ANALYSIS OF ECOLAB'S OBJECTIONS

*The standards governing review of Judge Schultz's discovery order are familiar.* On review of a magistrate judge's ruling on a nondispositive issue, a district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); D. Minn. LR 72.2(a)(3)(A); *Ferguson v. United States*, 484 F.3d 1068, 1076 (8th Cir. 2007). A ruling is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Wells Fargo & Co. v. United States*, 750 F. Supp. 2d 1049, 1050 (D. Minn. 2010) (citation omitted). A decision is contrary to law when a court "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.* (citation omitted). This standard of review is "extremely deferential." *Magee v. Trs. of the Hamline Univ.*, 957 F. Supp. 2d 1047, 1062 (D. Minn. 2013).

*The Amended Complaint asserts no claim based on IBA's alleged development or manufacture of non-Ecolab branded teat-dip products.* Ecolab's claims arise from IBA's (1) continued manufacturing, marketing, and selling of Ecolab-branded products during the Agreement's implied extension or after the Agreement's termination, and (2) IBA's marketing or selling its own non-Ecolab-branded products during the Agreement's implied-in-fact extension and after the Agreement's termination. The former category is not in play in this discovery dispute. The latter does not implicate IBA's development or manufacture (as distinct from the marketing or sale) of IBA's products. Ecolab's breach-of-contract claim explicitly challenges only IBA's "marketing" of and "selling or

11

offering to sell" non-Ecolab branded products, not the manufacturing of these products. Am. Compl. ¶¶ 40–48.[4] The same is true of Ecolab's trade-secret claims, though for a slightly different reason. Just about every paragraph supporting this claim refers explicitly to IBA's use of trade secrets to "make and have made" Ecolab-branded—that is, "Covered"—products that are not implicated by this motion. *See id.* ¶¶ 66–68. It is true that one paragraph of Ecolab's DTSA claim seems broader. It alleges: "Additionally, [IBA] continued to make or have made products incorporating the Ecolab Trade Secrets after the January 6, 2022 termination of the License Agreement." *Id.* ¶ 69. But it would be a mistake to understand this single paragraph to convey a trade-secret claim concerning IBA's development and manufacture of non-Ecolab-branded products. That would be a big claim. The claim would be easy to allege in clear terms. The paragraph is vague. Regardless, the paragraph's reference to "after the January 6, 2022 termination of the License Agreement" is most naturally understood as referring to the pre-January 6, 2022 period described in the immediately preceding paragraph, and that paragraph explicitly references only Ecolab-branded products. *See id.* ¶¶ 68–69. Ecolab's remaining claims depend on IBA's use of Ecolab's trademarks. *See id.* ¶¶ 83–86, 94–99. The unlawful use of trademarks implicates no need for discovery into a product's development or

---

[4] The breach-of-contract claim includes one reference to IBA's manufacture of products. The allegation, however, is specific to "Covered"—or Ecolab-branded—products: "IBA breached these provisions of the License Agreement, including by having *Covered Products* made after the termination of the License Agreement and by failing to return or destroy Ecolab's confidential information." Am. Compl. ¶ 49 (emphasis added). Again, Ecolab's ability to obtain discovery regarding IBA's manufacture of Ecolab-branded products is not in play here.

12

manufacture. There are two more tells. First, in its brief supporting the motion to compel, Ecolab claimed: "The speed at which IBA was able to develop and sell these Non-covered Products supports Ecolab's contention that IBA used Ecolab's trade secret and confidential information." ECF No. 173 at 22. That may be so, but neither this key supporting allegation nor anything like it appears in the Amended Complaint. If Ecolab asserted contract or trade-secret claims concerning IBA's development and manufacture of its own products, one would expect the Amended Complaint to include this and similar allegations. Second, in the prayer for relief, the Amended Complaint explicitly seeks an injunction preventing IBA "from *marketing*, *advertising*, or *selling* any ASC teat dip product for an appropriate period of time." Am. Compl. at 18, ¶ B (emphasis added). No manufacturing-directed injunction is requested.

*The absence of this claim means the requested discovery is irrelevant or, if relevant in some respect, disproportional to the case's needs.* Federal Rule of Civil Procedure 26(b)(1) limits the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The "focus [is] on the 'actual claims and defenses involved in the action.'" *Fergin v. Westrock Co.*, No. 16CV26, 2017 WL 5990129, at *3 (D. Neb. Dec. 1, 2017) (citing Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment); *see Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 7042117, at *4 (D. Minn. July 25, 2016) ("[T]he scope of discovery is intended to focus on the actual claims or defenses that are [at] issue in the litigation."). Absent a development- or manufacturing-specific claim directed at IBA's own teat-dip products, it is difficult to understand how the discovery

13

Ecolab seeks might be relevant in the Rule 26(b)(1) sense. Regardless, there is little room to doubt that the requested discovery would be quite burdensome, certainly for the parties. These burdens outweigh by a substantial measure whatever relevance the requested discovery might have. On this basis, Ecolab's objections will be overruled, and Judge Schultz's order affirmed in these respects.

*Ecolab's arguments do not justify a different result.* Ecolab's primary argument is that Judge Schultz's decision to deny discovery as to IBA's development and manufacture of IBA's products amounts to a dispositive ruling that can't be made to resolve a discovery dispute. ECF No. 264 at 16. This is not persuasive. For purposes of discovery, claims drive relevance determinations. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. Here, Judge Schultz reviewed the Amended Complaint to determine what claims Ecolab asserted. So did I. We reached the same conclusion: The Amended Complaint asserts no claim arising from IBA's development or manufacture of IBA's products. Ecolab also argues that the judicial-estoppel determination relies on a misunderstanding of Ecolab's in-court statements. The decision to overrule Ecolab's objections with respect to this issue does not rely on Ecolab's statements, its litigation position, or judicial-estoppel rules. It's all about the absence of a development- or manufacturing-specific claim directed at IBA's non-Ecolab-branded products.[5]

---

[5] Alternatively, Ecolab seeks leave to amend its Amended Complaint to plead trade-secret misappropriation claims directed at IBA's own products. ECF No. 264 at 20–21. Ecolab filed no motion under D. Minn. LR 15.1. The request will therefore be denied without prejudice to Ecolab's right to file such a motion in the ordinary course. *See Ellis v. City of Minneapolis*, 518 F. App'x 502, 504-05 (8th Cir. 2013) ("We have repeatedly

*Ecolab's request for discovery regarding IBA's post-termination marketing and sales of IBA's products is consistent with Ecolab's case theory, and the key "accrued obligation" question has not been briefed.* To recap, Ecolab says IBA breached ¶ 2.5b of the Agreement by marketing IBA's own products "before the expiration of the one-year [notice] covenant it owes to Ecolab." Am. Compl. ¶ 46. Ecolab says that ¶ 2.5b's one-year notice requirement "survived" the Agreement's termination "as an accrued obligation." *Id.* ¶ 44. And Ecolab wants discovery regarding IBA's marketing and sales of its products to determine the extent of this alleged breach. Judge Schultz denied the motion to compel this discovery on the legal ground that Ecolab's underlying, notice-covenant breach claim is not viable. Judge Schultz reasoned that the Agreement "did not provide for post-termination survival of the non-compete and notice provisions." ECF No. 247 at 10 n.6. There is support for this conclusion. Paragraph 5.6 lists fourteen of the Agreement's paragraphs that "shall survive termination or expiration of th[e] Agreement." ECF No. 61-1 ¶ 5.6. Paragraph 2.5b is not among them. *See id.* Regardless, several considerations justify sustaining Ecolab's objection. IBA did not seek dismissal of this breach theory, meaning it has not been the subject of dispositive-motion practice and remains in the case. Ecolab's "accrued obligation" theory has not been briefed, meaning

---

held that a district court does not abuse its discretion in denying leave to amend when the party seeking leave has failed to follow procedural rules or failed to attach the proposed complaint."); *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp.*, 690 F.3d 951, 958 (8th Cir. 2012) ("A district court does not abuse its discretion in denying leave to amend when a plaintiff has not submitted a proposed amended pleading in accord with a local procedural rule.").

the issue would be resolved outside the adversarial process.[6]  Better to resolve this legal question, and perhaps other related legal questions, in the usual way.  Finally, sustaining the objection will not significantly change the scope of discovery.  Under Judge Schultz's order, this discovery was confined to the period between May 31, 2019, and January 6, 2022.  ECF No. 247 at 10–11.  Sustaining the objection will add between one year and roughly eighteen months to this period.  *See* ECF No. 264 at 14–15.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT** Ecolab's Objections [ECF No. 264] to Magistrate Judge Schultz's March 12, 2024 order [ECF No. 247] are **OVERRULED in part** and **SUSTAINED in part** as follows:

1. Ecolab's objections to that part of the March 12, 2024 order denying Ecolab's motion to compel discovery regarding IBA's alleged use of Ecolab's trade secrets to develop and manufacture non-Ecolab-branded products are **OVERRULED**.

2. Ecolab's objections to that part of the March 12, 2024 order denying Ecolab's motion to compel discovery regarding IBA's marketing and sale of IBA's products after January 6, 2022 are **SUSTAINED**.

Dated:  July 17, 2024                                     s/ Eric C. Tostrud
                                                                       Eric C. Tostrud
                                                                       United States District Court

---

[6]   It is not clear what "accrued obligations" means as that term is used in ¶ 5.6.  Independent research revealed no obvious answer.